UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| **CAYUGA NATION and CLINT HALFTOWN,** | |
| *Plaintiffs*, | |
| -vs- | **COMPLAINT** |
| **THE COUNTY OF CAYUGA, NEW YORK, THE COUNTY OF SENECA, NEW YORK, and MARK BALISTRERI, in his Official Capacity as Director of the New York State Office of Interoperable & Emergency Communications,** | Case No. <br><br> Jury Trial Demanded |
| *Defendants*. | |

---

Plaintiffs, the Cayuga Nation (the "Nation") and Clint Halftown, by and through their undersigned counsel, as and for their Complaint against Defendants the County of Cayuga, New York ("Cayuga County"), the County of Seneca, New York ("Seneca County," and, together with Cayuga County, the "Counties"), and Mark Balistreri, in his official capacity as Director of the New York State Office of Interoperable & Energy Communications (collectively "Defendants"), allege as follows.

## INTRODUCTION

1. This is a civil action seeking injunctive relief and damages for the Defendants' unlawful refusal to transmit emergency 911 calls made to the Counties' E-911 Public Safety Answer Points ("PSAP") to the Nation's police units, thereby violating the Nation's rights under federal law.

2. Notwithstanding the clear and unequivocal statewide policy of the New York State Office of Interoperable and Emergency Communications to maximize the interoperability of public

safety agency access to the E911 systems across the state, including specific direction that tribal police agencies are to be included in E911 center interoperability, the Counties have outright refused to provide such access to the Nation's duly established police force: the Cayuga Nation Police Department ("CNPD").

3. Upon information and belief, the Counties have provided such access to each and every other public safety agency operating within their borders, including volunteer fire departments and ambulance corps. Yet, the Counties steadfastly refuse to provide access to the CNPD, a federally recognized law enforcement agency made up of seasoned and certified officers and leadership.

4. Every request the CNPD has made to be allowed access to the E911 systems has been met either with quibbling about the cost—even though, upon information and belief, no other agency has paid a fee to connect—or outright silence.

5. The CNPD, under federal law, has concurrent jurisdiction within the Nation's 64,015-acre reservation as established by the Treaty of Canandaigua (the "Reservation") over crimes committed by Native Americans. And the CNPD always has the right to respond and detain even non-Indians within the Reservation until a state, county, or local agency takes responsibility for the detainee. Often, within the Reservation, a CNPD officer is the closest, most available law enforcement officer suitable to respond to a given emergency.

6. However, too often, the CNPD is not even aware of emergencies occurring within the Reservation involving the Nation's property or citizens until after other agencies are apprised of the emergency through the E911 system.

7. Moreover, a great deal of interagency coordination occurs through the E911 system during emergency situations. Exclusion of the CNPD from the system leaves the CNPD officers

sometimes unaware of other agency activities within the Reservation, and also leaves other agencies unaware of the CNPD officers' activities. Such lack of coordination is dangerous and the exact reason the State has encouraged full interoperability between all agencies in a given geography.

8. The continued refusal to connect the CNPD to the Counties' E911 systems is causing a dangerous situation. It is time for the Defendants to stop discriminating against the CNPD as an agency of the Cayuga Nation, and provide CNPD the access it has requested. Until it does so, the Nation's citizens and property are at undue risk.

## PARTIES

9. The Cayuga Nation is a federally recognized sovereign Indian nation. *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 Fed. Reg. 54654, 54655 (Aug. 11, 2023). The Nation is located on Reservation territory spanning portions of Cayuga County and Seneca County. The Nation exercises inherent sovereign governmental authority within its Indian Lands and on behalf of the health and welfare of the Nation and its citizens ("Nation Citizens").

10. Clint Halftown is a Cayuga Nation citizen who resides within the Nation's Reservation in Seneca County, NY, and within the Western District of New York. Mr. Halftown relies on the CNPD as a law enforcement first responder.

11. In the 1794 Treaty of Canandaigua, the United States recognized a federal reservation for the Nation comprising 64,015 acres—located within what today are Seneca and Cayuga Counties, New York—and pledged that the "reservation[ ] shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." Treaty of Canandaigua of 1794, art. II, 7 Stat. 44, 45.

12. The Nation's Reservation has continuously existed for over 200 years, up through today.

13. This action is brought by and on behalf of the Nation in the exercise of its authority as a sovereign government and under its *parens patriae* authority in the public interest to protect the health, safety, and welfare of all Nation Citizens, as well as to recover damages and seek other redress for harm caused by the Defendants' improper actions.

14. Defendant, County of Cayuga, New York, is a political subdivision of the State of New York, with its principal officed located at160 Genesee Street, Auburn, New York 13021.

15. Defendant, County of Seneca, New York, is a political subdivision of the State of New York, with its principal officed located 1 DiPronio Drive, Waterloo, New York 13165.

16. Defendant, Mark Balistreri, in his official capacity as Director of the New York State Office of Interoperable and Emergency Communications, is responsible for all interoperable and emergency communications issues in New York.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 (because the Nation's claims arise under federal law); and 28 U.S.C. § 1362 (because this case is brought by an Indian nation and arises under federal law).

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) both because the Defendant Counties reside in the district, and because a substantial part of the events and omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

*The Counties' 911 Facilities*

19. The Federal Communications Commission created the 911 system as a means to provide a nationwide contact for emergency services. Authority is delegated to the states to develop and maintain 911 systems.

20. In New York, the 911 system is regulated by the Division of Homeland Security and Emergency Services. County Law § 326; *see Matter of Estrella G.-C*, 63 Misc.3d 1216(A), 1216 (Fam. Ct. Kings Cnty. 2019).

21. Authority for the implementation and maintenance of 911 systems is delegated to counties, but is overseen by the State Interoperable and Emergency Communications Board ("SIEC"). County Law §§ 326 and 328; *see Cellco P'Ship v. County of Otsego*, 296 A.D.2d 633, 634 (3d Dep't 2002).

22. The SIEC "***shall*** promulgate minimum standards regarding direct dispatch of all emergency services and jurisdictional protocols." County Law § 328(4)(b) (emphasis added).

23. A PSAP is a call center responsible for answering emergency telephone calls for police, firefighting, and ambulance services. When an individual dials 911, the call is routed to the nearest PSAP based on the caller's location. The PSAP is staffed by trained personnel who gather critical information from the caller, determine the nature and location of the emergency, and then dispatch the appropriate emergency responders to the scene.

24. PSAPs play a crucial role in the emergency response system by ensuring that calls for help are promptly and accurately directed to the necessary emergency services, thereby facilitating timely and effective responses to emergencies.

25. Enhanced 911, commonly known as E911, is an advanced emergency response system designed to improve the accuracy and efficiency of emergency services. When an individual makes an emergency call using the E911 system, the call is not only routed to the nearest PSAP, but the E911 systems automatically convey the caller's location information including precise geographic coordinates for mobile phones, or a specific street address for landline phones.

26. This capability greatly enhances the ability of emergency responders to locate and assist individuals in distress, even if the caller is unable to provide their location verbally.

27. Seneca County owns and operates an E911 PSAP for the purpose of routing emergency 911 calls to appropriate emergency services to protect the health and wellbeing of residents of Seneca County.

28. Cayuga County owns and operates an E911 PSAP for the purpose of routing emergency 911 calls to appropriate emergency services to protect the health and wellbeing of residents of Cayuga County (together, with those of Seneca County, the "E911 Centers").

29. The New York Office of Interoperable and Emergency Communications is the official government agency responsible for all interoperable and emergency communications issues, and is responsible for coordinating with federal, state, local, tribal, non-governmental, and other appropriate entities for the implementation of E911 operations throughout New York.

30. The policy of the SIEC is to broaden interoperability of 911 systems throughout the state across all public safety practitioners. For example, the SIEC issued a "New York Statewide Interoperability Plan" ("SCIP") in January 2024. https://www.dhses.ny.gov/2024-statewide-communications-interoperability-plan-scip. The SCIP begins with a letter from the Statewide Operability Coordinator, Mark Balistreri. *Id.* at p. 1. Therein, Mr. Balistreri states that the SCIP:

> represents the state's continued commitment to improving emergency communications interoperability and supporting public

6

safety practitioners throughout the state." *Id.* Further, "[a]s we continue to enhance interoperability, we must remain dedicated to improving our ability to communicate among disciplines and across jurisdictional boundaries. With help from safety practitioners statewide, we will work to achieve the goals set forth in the SCIP and become a nationwide model for statewide interoperability. *Id.*

31. Regarding interoperability, the SCIP states the SIEC's mission:

To implement our vision of effective interoperable and emergency communications, the [SIEC] Board will continue to develop and support communications partnerships inclusive of local, state, **tribal** and Federal public safety agencies, through the efficient development and use of communication resources, policies, procedures, training, and exercises.

*Id.* at p. 4 (emphasis added).

32. The SIEC identified the need for "[i]ncreased tribal involvement, collaborative efforts with neighboring counties, and enhanced interoperable communications with neighboring states and provinces [as] key components of the envisioned state." *Id.* at p. 9. Thus, in spirit and by the letter, the SIEC has a policy that county E911 services *must* integrate the CNPD into their system.

### *The Nation and its Police Department*

33. The Nation is a federally-recognized Indian nation, and it maintains the CNPD as authorized by the Indian Self-Determination Act of 1975. The CNPD is a federally-recognized law enforcement agency that exercises law enforcement jurisdiction over the entirety of the Nation's 64,015-acre Reservation which falls within portions of Seneca County and Cayuga County.

34. The lands within the Nation's federally-recognized Reservation qualify as "Indian country."

35. Congress has defined "Indian country" to include "*all* land within the limits of *any* Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent." 18 U.S.C. § 1151(a) (emphasis added).

36. The Cayuga Nation has a federal Reservation recognized by the 1794 Treaty of Canandaigua.

37. "[E]very federal court" to consider the question, as well as the New York Court of Appeals, has agreed that the Nation's federal Reservation continues to exist and has not been disestablished. *Cayuga Indian Nation of N.Y. v. Gould*, 14 N.Y.3d 614, 640 (2010); *see Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 260 F. Supp. 3d 290, 307-15 (W.D.N.Y. 2017) (collecting cases).

38. The Nation and the CNPD are charged with providing for the safety and welfare of Nation Citizens, as well as others that are located on the Nation's Reservation.

39. The Cayuga Nation also has criminal jurisdiction over the "Indian country" within its Reservation. The Nation has exercised that criminal jurisdiction by, among other things, creating the CNPD.

40. By letter dated June 17, 2019, the United States Bureau of Indian Affairs ("BIA") expressly recognized that "the Cayuga Indian Nation may enforce its own criminal laws against Indians within the boundaries of the Reservation." A copy of the June 17, 2019 letter is attached hereto, and incorporated herein, as **Exhibit A**.

41. The BIA's June 17, 2019 letter is consistent with settled principles of Indian law recognizing the inherent authority of Indian nations within Indian country to enact criminal laws, to apply those laws to Nation Citizens and other Indians, and to create police forces, court systems, and incarceration facilities to enforce those laws.

42. The Supreme Court first acknowledged these principles almost 200 years ago in *Worcester v. Georgia*, 31 U.S. 515, 560-61 (1832).

36. The Cayuga Nation has a federal Reservation recognized by the 1794 Treaty of Canandaigua.

37. "[E]very federal court" to consider the question, as well as the New York Court of Appeals, has agreed that the Nation's federal Reservation continues to exist and has not been disestablished. *Cayuga Indian Nation of N.Y. v. Gould*, 14 N.Y.3d 614, 640 (2010); *see Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 260 F. Supp. 3d 290, 307-15 (W.D.N.Y. 2017) (collecting cases).

38. The Nation and the CNPD are charged with providing for the safety and welfare of Nation Citizens, as well as others that are located on the Nation's Reservation.

39. The Cayuga Nation also has criminal jurisdiction over the "Indian country" within its Reservation. The Nation has exercised that criminal jurisdiction by, among other things, creating the CNPD.

40. By letter dated June 17, 2019, the United States Bureau of Indian Affairs ("BIA") expressly recognized that "the Cayuga Indian Nation may enforce its own criminal laws against Indians within the boundaries of the Reservation." A copy of the June 17, 2019 letter is attached hereto, and incorporated herein, as **Exhibit A**.

41. The BIA's June 17, 2019 letter is consistent with settled principles of Indian law recognizing the inherent authority of Indian nations within Indian country to enact criminal laws, to apply those laws to Nation Citizens and other Indians, and to create police forces, court systems, and incarceration facilities to enforce those laws.

42. The Supreme Court first acknowledged these principles almost 200 years ago in *Worcester v. Georgia*, 31 U.S. 515, 560-61 (1832).

43. These principles recognize that, although the Nation and its Reservation exist within the boundaries of the United States and New York State, the "sovereignty retained by tribes includes 'the power of regulating their internal and social relations.'" *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983) (quoting *United States v. Kagama*, 118 U.S. 375, 381-82 (1886)).

44. A core part of Indian nations' retained sovereignty is the authority to enforce tribal law. Thus, the Supreme Court has explained that Indian nations' "right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions," and that "[i]t is undisputed that Indian tribes have power to enforce their criminal laws against tribe members." *United States v. Wheeler*, 435 U.S. 313, 322 (1978); *see Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975).

45. Courts have repeatedly and expressly recognized Indian nations' inherent authority and right to form police forces. The Ninth Circuit, for example, has explained that "Indian tribal police forces have long been an integral part of . . . tribal criminal justice systems and have often performed their law enforcement duties to the limits of available jurisdiction," and that the "propriety of operation of tribal police forces has been recognized, presently and in the past, by the federal government." *Ortiz-Barraza*, 512 F.2d at 1179. So too, the Supreme Court has "not . . . question[ed] the authority of tribal police to patrol . . . within a reservation." *Strate v. A-1 Contractors*, 520 U.S. 438, 456 n.11 (1997).

46. Indian nations sometimes choose to avail themselves of federal funding to support their law enforcement functions under the Indian Self-Determination and Education Assistance Act of 1975 (ISDEAA), Pub. L. 93-638; *see* 25 U.S.C. § 5301 *et seq.* Likewise, Indian nations sometimes choose to enter cross-deputization agreements with federal and/or state authorities under

9

the ISDEAA, the Tribal Law and Order Act of 2010, or state law. *See* 25 U.S.C. § 2801 *et seq.*; 25 C.F.R. Part 12.

47. Such arrangements, however, are not necessary for Indian nations to exercise their criminal jurisdiction or to create law enforcement agencies, which instead are powers inherent in Indian nations' retained sovereignty.

48. Consistent with these principles, many of New York's Indian tribes maintain police forces, including the Oneida Indian Nation, the Seneca Nation of Indians, and the Saint Regis Mohawk Tribe. Although the police force of the Saint Regis Mohawk is expressly authorized by New York statute and enforces New York state laws, *see* New York Indian Law § 114, the other nations did not—and did not need to—obtain any authorization to create a tribal police force to enforce tribal laws.

49. In 2018, the Cayuga Nation exercised its inherent authority to create a police force and a criminal justice system.

50. The Nation, by Ordinance No. CN-2018-1, established an office of the Commissioner of Public Safety. This ordinance further granted the Commissioner of Public Safety the power to establish a police force, whose primary function is criminal detention, apprehension, and investigation of suspected violations of the Nation's criminal laws.

51. The Nation appointed Arthur F. Pierce, a former Captain of the New York State Police, as its Public Safety Commissioner.

52. On May 18, 2018, the Nation appointed Colonel Mark Lincoln, also a former member of the New York State Police, as its first Superintendent of Police.

53. On May 31, 2018, the Nation entered into an agreement with Cambria County, Pennsylvania to house persons in the custody of the Nation's Police Force.

54. The Nation obtained and outfitted police vehicles, and supplied uniforms and badges for the Nation Police.

55. The Nation's Police Force promulgated a Policy Manual that governs the conduct of its officers.

56. The Nation has adopted and implemented the Cayuga Nation Rules of Criminal Procedure and the Cayuga Nation Penal Code.

57. The Nation has established a court system with jurisdiction under Nation law over offenses defined in the Nation's Penal Code, including a trial court, appellate court, prosecutor, and public defender.

58. The Nation's Police Force began operating on July 31, 2018, and has been operating continuously since that date.

59. The Nation's Police Force now numbers approximately 20 officers, all of whom are experienced law enforcement professionals and have been previously certified by the New York State Division of Criminal Justice Services. The Nation's Police Force patrols the Nation's Reservation daily and regularly confronts potential criminal suspects.

60. The Nation has access to the FBI's Criminal Justice Information System ("CJIS") databases. *See* 28 U.S.C. § 534(d). The FBI initially denied the Nation's application on the ground that "a leadership dispute still exists within the Nation." Letter Decision, Trudy Lou Ford, FBI Criminal Justice Information Services Division (Feb. 4, 2021). The Cayuga Nation challenged that decision in federal court, and the court reversed it. *Cayuga Nation v. United States*, 594 F. Supp.3d 64 (D.D.C. 2022). The FBI then approved access to CJIS databases for the Nation.

61. The Nation's Police Force regularly coordinates with state, local, and federal law enforcement officers and works in harmony with these law enforcement agencies.

62. In short, the CNPD is fully equipped, trained, and capable of responding to emergency calls, including 911 calls, within its jurisdiction.

### *The Counties' Continued Refusal to Provide CNPD Access to E911 Centers*

63. Despite the fact that the Nation and CNPD have law enforcement and emergency jurisdiction over Nation land, the Defendant Counties have, without reason or justification, rejected the Nation's request to connect the CNPD to the respective E911 Centers. As a result, when a person calls 911 while on Nation land, CNPD is not notified and therefore cannot respond to the emergency in a timely manner.

64. When an emergency occurs on Nation Reservation territory, CNPD officers often are the closest available police units and are capable of providing the most expeditious response. CNPD has the authority to investigate and prosecute crimes committed on Nation Reservation territory, and is equipped to respond and assist with other, non-criminal emergencies.

65. Despite CNPD being in the best position to respond to emergencies occurring on Nation Reservation territory, the Defendant Counties refuse to transmit emergency 911 calls to CNPD and instead transmit such calls to other, non-Nation law enforcement agencies.

66. In January 2024, the Nation sought meetings with the Defendant Counties to request that emergency 911 calls originating within Nation Reservation territory be transmitted to CNPD, but the Defendant Counties refused to grant the request. Indeed, Cayuga County indicated that it might consider transmitting emergency 911 calls to the CNPD only if the Nation agreed to pay for the privilege of such a service.

67. The Defendant Counties' refusal to transmit 911 calls to CNPD units endangers the health and safety of individuals within Nation Reservation territory, and undermines the Nation's sovereignty and ability to provide for the welfare of Nation Citizens.

68. The refusal to transmit emergency 911 calls to the CNPD constitutes discrimination and violates the Nation's rights under federal law. The Defendant Counties are placing Nation Citizens in serious, sometimes life-threatening danger by baselessly refusing to transmit 911 calls to the CNPD.

69. By way of example, in April 2023, the CNPD was not notified of a residential fire in Seneca Falls, New York, and therefore did not immediately respond to the emergency. In October 2023, the CNPD was not notified of a domestic dispute. In both instances, CNPD had jurisdiction and could have responded quickly and likely before other law enforcement. But, because of the Defendant Counties' refusal to recognize the Nation's sovereignty and law enforcement authority, the Nation was deprived of its right to self-governance, as the CNPD was deprived of notice of the ongoing emergency.

70. The closest law enforcement facility to Mr. Halftown's residence is the CNPD headquarters at 2540 NY-89, Seneca Falls, New York at a distance of approximately one mile. In addition to CNPD officers at CNPD headquarters, the CNPD officers are often nearby Mr. Halftown's residence while patrolling Nation owned properties within the Reservation. Should Mr. Halftown ever need to call 911, the CNPD would almost certainly have the fastest response time.

71. The Defendant Counties have and continue to deprive the Nation and Mr. Halftown of their rights afforded under federal law.

**FIRST CAUSE OF ACTION**
**(Violation of the Equal Protection Clause of the 14th Amendment of the United States Constitution)**

72. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 71 as if fully set forth herein.

73. The 14th Amendment of the United States Constitution provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

74. Upon information and belief, Seneca County and Cayuga County provide full access to the Counties' respective E911 systems to every law enforcement, fire department, and ambulance corp. within the Counties other than to the CNPD.

75. There is no basis, rational or otherwise, to deny the CNPD access to the E911 systems.

76. Upon information and belief, although Cayuga County has stated that CNPD would need to pay for access, no other agency in Cayuga County has paid or been required to pay for such access.

77. In fact, the CNPD has indicated it would install all necessary equipment in its vehicles and facilities necessary to access the E911 systems at the CNPD's cost.

78. Upon information and belief, the only basis for the Counties' continued denial of access to CNPD, a federally-recognized police agency, is that the CNPD is the police agency of an Indian Nation.

79. Mr. Halftown, a citizen of the Cayuga Nation and an Indian as defined under federal law, relies on the CNPD for law enforcement response and protection, just as every Nation Citizen residing within the Nation's Reservation relies on the CNPD.

80. The continued disparate treatment of the CNPD and the Nation's Citizens, including Mr. Halftown, with respect to law enforcement access to the counties' E911 systems is a violation of Plaintiffs' rights to equal protection.

81. By refusing to transmit emergency 911 calls to CNPD and transmitting them solely to other, non-Nation law enforcement agencies, the Defendants are stripping away the Nation's right to self-government and to enforce the law on Nation land.

82. As a result of the foregoing, the Nation's and Mr. Halftown's 14th Amendment rights to equal protection has been violated, and the Nation and Mr. Halftown are entitled to injunctive and monetary relief in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Violation of the 42 U.S.C. § 1983)**

83. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 82 as if fully set forth herein.

84. The Defendants, acting under color of state law, have deprived the Nation and Mr. Halftown, individually, of the rights, privileges, and immunities secured by the Constitution and the laws of the United States, in violation of 42 U.S.C. § 1983.

85. The Defendants are acting under color of state law in that they are administering the E911 system pursuant to state statute and regulations.

86. As set forth above, Defendants' continuing actions to prevent the CNPD access to the county E911 systems is a violation of the Nation's and Mr. Halftown's constitutional rights, including their right to Equal Protection.

87. As a result of the foregoing, the Nation and Mr. Halftown have been harmed in an amount to be determined at trial.

88. The Nation and Mr. Halftown are further entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## THIRD CAUSE OF ACTION
### (Declaratory and Injunctive Relief)

89. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 88 as if fully set forth herein.

90. The Nation has demanded that Defendants transmit emergency 911 calls originating on Nation Reservation territory to CNPD units.

91. An actual and immediate controversy exists between the Nation and Defendants concerning the Defendants' obligations to transmit emergency 911 calls to the CNPD and to otherwise provide the CNPD with full access to the Counties' E911 system.

92. The Nation and Mr. Halftown are entitled to a declaratory judgment that the Defendants' refusal to transmit emergency 911 calls to the CNPD is unlawful, and to injunctive relief enjoining the Defendants from continuing such unlawful conduct.

**WHEREFORE,** Plaintiffs demand a Judgment of this Court in their favor against Defendants for:

a. On the First Cause of Action, damages in an amount to be determined at trial, and equitable, injunctive, and declaratory relief to be determined;

b. On the Second Cause of Action, damages in an amount to be determined at trial, and equitable and declaratory relief to be determined;

c. On the Third Cause of Action, an Order declaring that Defendants' refusal to transmit emergency 911 calls originating within Nation Reservation territory to CNPD is unlawful, and an injunction requiring the Defendants to transmit all emergency 911 calls originating within the Nation's land to the CNPD;

d. The attorneys' fees, costs, and disbursements of this action; and

e. Such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues that are so triable.

**Dated:** July 5, 2024                                        **BARCLAY DAMON LLP**

By: _/s/ David G. Burch, Jr._____
David G. Burch, Jr.
Michael E. Nicholson

*Attorneys for Plaintiffs*
Office and Post Office Address
125 East Jefferson Street
Syracuse, New York 13202-2078
Tel: (315) 425-2788

17